[PUBLISH]

In the

# United States Court of Appeals

For the Eleventh Circuit

_____

No. 21-14503

_____

ROBERT PONZIO,
ALEX ACUNA,
BRIAN MADSEN,
VANESSA M. MONTGOMERY,
ROBERT MULL,
HADIYA NELTHROPE,
SAMUEL SALGADO,
FREDERICK J. PARKER,
On behalf of themselves and all others
similarly situated,

                                        Interested Parties-Appellants,

*versus*

EMILY PINON,
GARY C. KLEIN,
KIM BROWN,

JOSHUA FRANKUM,
TODD BRYAN,
DINEZ WEBSTER,

                                                    Plaintiffs-Appellees,


DAIMLER AG,
MERCEDES BENZ USA, LLC,

                                                    Defendants-Appellees.


_____

Appeal from the United States District Court
for the Northern District of Georgia
D.C. Docket No. 1:18-cv-03984-MHC

_____

Before JORDAN, NEWSOM, and ED CARNES, Circuit Judges.

JORDAN, Circuit Judge:

　　In this class action case, objectors to a proposed settlement agreement claimed that it left 80% of the class members without any benefits whatsoever.  The district court took the allegation seriously, addressed it at the fairness hearing, and ultimately rejected it as meritless.  We come to the same conclusion and hold that the

district court did not abuse its discretion in approving the class action settlement.

**I**

According to Michel Pastoureau, a historian of colors, red was "the first color humans mastered, fabricated, reproduced, and broke down into different shades[.]" Michel Pastoureau, Red: The History of a Color 7 (Jody Gladding trans., Princeton Univ. Press 2017). "It was with red that humans [conducted] their first color experiments, achieved their first successes, and then constructed a chromatic universe." *Id*. at 12. Centuries later, humans continue to fabricate and reproduce shades of red, sometimes with varied degrees of success. One particular shade of the color is where this case begins.

For years, Mercedes-Benz USA and Daimler AG have sold and leased a number of different Mercedes-Benz vehicles painted in a color called 590 Mars Red. Either due to a defect in the paint or some other reasons—the answer is not clear—the paint on some of these vehicles has deteriorated.

Emily Pinon is the owner/lessee of a Mercedes-Benz vehicle painted in Mars Red. Soon after she purchased her car in 2016, she began to have issues with the paint—"it looked as though the clear coat was bubbling and peeling." D.E. 1 at 8. In August of 2018, she filed a class action lawsuit in the Northern District of Georgia against Mercedes-Benz and Daimler. Ms. Pinon asserted numerous claims under federal and state law "for the design, manufacturing, marketing, and sale of vehicles with defective paint." *Id*. at 1.

She alleged that her vehicle, and thousands of others like it, "suffer[ed] from an irreparable defect in the exterior paint that result[ed] in peeling, flaking, bubbling, erosion, and microblistering of the clearcoat." *Id*. at 13.[1]

The third amended class action complaint, the operative pleading, named six other individuals as plaintiffs: Gary Klein, Kim Brown, Joshua Frankum, Nancy Pearsall, Dinez Webster, and Todd Bryan (collectively the "Pinon plaintiffs"). And it identified a number of "Class Vehicles"—vehicles painted in Mars Red—which allegedly "ha[d] a serious latent defect that cause[d] the exterior surfaces of the vehicles to microblister, peel, and bubble absent any external or environmental influence." D.E. 55 at 2. The Pinon plaintiffs asserted twelve legal claims and requested that the district court certify the class, appoint them and their counsel to represent the class, grant declaratory and injunctive relief, and award compensatory damages, punitive damages, and attorneys' fees.

The Pinon plaintiffs, individually and on behalf of a proposed nationwide settlement class, advised the district court in December of 2020 that they had reached a settlement with Mercedes-Benz and Daimler. The Pinon plaintiffs submitted a motion for preliminary approval of the proposed class action settlement agreement and preliminary certification of the nationwide settlement. The motion indicated that the proposed settlement "offer[ed]

---

[1] A couple of weeks before Ms. Pinon filed suit, other owners/lessees of Mercedes-Benz vehicles painted in Mars Red instituted a similar federal class action in New Jersey. More on that action soon.

monetary reimbursement for [q]ualified [p]ast [r]epairs and extended warranty coverage for [q]ualified [f]uture [r]epairs and . . . provide[d] direct benefits to current and former owners and lessees of over 72,500 Subject Vehicles sold and/or leased in the United States, which will likely include over one hundred thousand individuals." D.E. 70 at 9.

So far, all of this seemed pretty routine for a class action. But this case seems to be as much about disputes between lawyers concerning control and money as it is about Mars Red paint. As noted, about two weeks before Ms. Pinon lodged her initial complaint, Robert Ponzio and others filed a similar class action complaint against the same defendants (Mercedes-Benz and Daimler) in the District of New Jersey. *See Ponzio, et al. v. Mercedes-Benz USA, LLC et al.*, Case No: 1:18-cv-12544 (D. N.J.). Like the Pinon plaintiffs' complaint in the Northern District of Georgia, the complaint filed in the District of New Jersey was based on alleged defects with the Mars Red paint on Mercedes-Benz vehicles. Collaboration between the Pinon plaintiffs and the plaintiffs in the District of New Jersey action (collectively the "Ponzio objectors") may have initially been forged with the goal of presenting a united front against Mercedes-Benz and Daimler in the two actions, but coordination and cooperation fell apart.[2]

---

[2] The record is replete with accusations made by one set of lawyers against the other. For example, the Ponzio objectors' counsel say that "the [Pinon] parties kept [Ponzio] counsel in the dark about covert negotiations." Br. for Appellants at 20. They also claim that the [Pinon] litigation was a "copycat class action." D.E. 72 at 6. For their part, the Pinon plaintiffs' counsel claim that

After the Pinon plaintiffs submitted their motion for preliminary approval of the settlement agreement in the Northern District of Georgia, the Ponzio objectors filed a motion to intervene and to continue the hearing for preliminary approval. According to the Ponzio objectors, "the proposed settlement would release the primary economic loss suffered by [c]lass members for diminution in value of their vehicles *without any compensation whatsoever*." D.E. 72 at 9–10 (emphasis in original). Among other things, the Ponzio objectors asserted that "the timing and secrecy of the proposed settlement . . . raise[d] a red flag as to whether it was the product of a collusive 'reverse auction.'" *Id*. at 23. The Pinon plaintiffs, Mercedes-Benz, and Daimler submitted responses in opposition.

The district court denied the Ponzio objectors' motion and granted the Pinon plaintiffs' motion for preliminary approval of the proposed class action settlement agreement. Notice to the class was provided and, several months later, the Pinon plaintiffs sought final approval of the class settlement agreement.

As required by Rule 23(e)(2), the district court held a fairness hearing. Counsel for the Pinon plaintiffs, the defendants, and the Ponzio objectors all presented arguments at the hearing. After the

---

"[Ponzio] counsel . . . us[ed] and benefit[ed] from the work [Pinon counsel] did," and that "[i]t was apparent that [Ponzio] counsel's definition of 'coordination' meant that [Pinon counsel] would relinquish control of [Pinon] and abide by whatever decisions were made by [Ponzio] counsel, which belied the notion of 'coordination.'" D.E. 76 at 14, 18.

hearing, the district court accepted supplemental briefing from the parties and from the Ponzio objectors.

Following its review and consideration of the post-hearing supplemental submissions, the district court approved the settlement agreement, certified the settlement class, confirmed appointment of class counsel, and granted in part and denied in part the Pinon plaintiffs' unopposed motion for attorneys' fees, expenses, and class representative service awards. As relevant here, and as discussed in more detail later, the district court rejected the contention of the Ponzio objectors that the settlement agreement failed to provide benefits to the great majority of the class members.

## II

We review the approval of a class action settlement for abuse of discretion, with factual findings subject to the clear error standard. *See Holmes v. Continental Can Co.*, 706 F.2d 1144, 1147 (11th Cir. 1983); *In re Equifax Inc. Customer Data Security Breach Litigation*, 999 F.3d 1247, 1273 (11th Cir. 2021); *Williams v. Reckitt Benckiser LLC*, 65 F.4th 1243, 1251 (11th Cir. 2023). The abuse of discretion standard generally provides a district court with a range of choice, which in practice means that we will sometimes affirm even though we might have resolved the matter differently in the first instance. *See Doe v. Rollins College*, 77 F.4th 1340, 1347 (11th Cir. 2023); *Waters v. Intern. Precious Metals Corp.*, 190 F.3d 1291, 1293 (11th Cir. 1999). Our "judgment" in reviewing the district court's approval of the settlement agreement is further "informed by the strong judicial policy favoring settlement as well as by the

realization that compromise is the essence of settlement." *Bennett v. Behring Corp.*, 737 F.2d 982, 986 (11th Cir. 1984). *See also In re U.S. Oil & Gas Litig.*, 967 F.2d 489, 493 (11th Cir. 1992) ("Public policy strongly favors the pretrial settlement of class action lawsuits."); William B. Rubenstein, 4 Newberg on Class Actions § 13:44 (6th ed. 2022) ("The law favors settlement, particularly in class actions and other complex cases where substantial resources can be conserved by avoiding lengthy trials and appeals.").

### III

Under Rule 23(e)(2), a district court may approve a class action settlement that binds class members "only after a hearing and only on finding that it is fair, reasonable, and adequate[.]" Since 2018, Rule 23(e)(2)—in subsections (A)-(D)—has set out four core concerns the district court must consider in making this determination. These are whether "[t]he class representatives and class counsel adequately represented the class"; whether "the proposal was negotiated at arm's length"; whether "the relief provided for the class is adequate" ("taking into account" the "costs, risks and delay of trial and appeal," "the effectiveness of any proposed method of distributing relief to the class, including the method of processing class-member claims," the "terms of any proposed award of attorney's fees, including timing of payment," and "any agreement required to be identified under Rule 23(e)(3)"); and whether "the proposal treats class members equitably relative to each other." *See* Rubenstein, 4 Newberg on Class Actions § 13:58 (explaining that "Rule 23 gave no further meaning" to the "fair, reasonable, and adequate" standard until Rule 23(e)(2) codified a list

of "four 'core concerns' that the Advisory Committee labeled 'the primary procedural considerations and substantive qualities that should always matter to the decision whether to approve the proposal'"). *See also* Fed. R. Civ. P. 23(e)(2), Advisory Committee's Note to 2018 Amendment.

Before the 2018 amendment to Rule 23(e)(2), we "also instructed district courts to consider several additional factors called the *Bennett* factors." *In re Equifax Inc.*, 999 F.3d at 1273 (citing *Bennett*, 737 F.2d at 986). These factors are

> (1) the likelihood of success at trial; (2) the range of possible recovery; (3) the point on or below the range of possible recovery at which a settlement is fair, adequate and reasonable; (4) the complexity, expense and duration of litigation; (5) the substance and amount of opposition to the settlement; and (6) the stage of proceedings at which the settlement was achieved.

*Bennett*, 737 F.2d at 986. At the end of the day, the district court acts "as a fiduciary for the class." *In re Equifax Inc.*, 999 F.3d at 1265. *See also* 7B Charles Alan Wright & Arthur R. Miller, Federal Practice & Procedure § 1797 (3d ed. & April 2023 update) ("The purpose of subdivision (e) is to protect the nonparty class members from unjust or unfair settlements affecting their rights when the representatives become fainthearted before the action is adjudicated or are able to secure satisfaction of their individual claims by a compromise, abandoning the claims of the absent class members.").

We have not yet interpreted the 2018 amendment to Rule 23(e)(2), *see In re Blue Cross Blue Shield Antitrust Litigation MDL 2406,*

___ F.3d ___, 2023 WL 7012247, at *9 (11th Cir. Oct. 25, 2023), or examined its effect on the *Bennett* factors. The 2018 amendment to Rule 23(e)(2) is not meant "to displace" the factors previously identified by courts in reviewing class action settlement agreements, but "rather to focus the court and the lawyers on the core concerns of procedure and substance that should guide the decision whether to approve the proposal." Fed. R. Civ. Pro 23(e)(2), Advisory Committee's Note to 2018 Amendment. The four core concerns set out in Rule 23(e)(2) provide the primary considerations in evaluating proposed agreements, *see Williams*, 65 F.3d at 1261, but we think that the *Bennett* factors can, where appropriate, complement those core concerns. For example, *Bennett* factors (1), (2), (4), and (6) can inform "whether the relief provided to the class is adequate" (core concern three). And *Bennett* factors (3) and (5) can inform "whether the proposal treats class members equitably relative to each other" (core concern four).

The "[p]roponents of class action settlements bear the burden of developing a record demonstrating that the settlement distribution is fair, reasonable and adequate." *Holmes*, 706 F.2d at 1147. *Accord Faught v. Am. Home Shield Corp.*, 668 F.3d 1233, 1239 (11th Cir. 2011); *Ault v. Disney World Co.*, 692 F.3d 1212, 1216 (11th Cir. 2012). Before addressing the Ponzio objectors' challenges to the settlement agreement, we describe the agreement and the proceedings below in detail.

### A

The settlement class is defined as "all current owners, former owners, current lessees, and former lessees of Subject Vehicles who purchased or leased their Subject Vehicle in the United States." D.E. 125 at 6. The term "Subject Vehicle" is defined as any Mercedes-Benz vehicle originally painted in the 590 Mars Red color and purchased or leased in the United States. *See* D.E. 70-1, Exh.1 (Class Action Settlement Agreement and Release) at § 1.35.

The class excludes certain persons. Not included in the class are those "who have settled with, released, or otherwise had claims adjudicated on the merits against [d]efendants that are substantially similar to the claims asserted . . . (i.e., alleging that 590 Mars Red paint is inadequate, of poor or insufficient quality or design, or defective, due to peeling, flaking, bubbling, fading, discoloration, or poor adhesion of the paint or clearcoat)[.]" D.E. 125 at 6-7.

Under the settlement agreement, class members—those within the definition of the settlement class who have not elected to opt out—receive two types of benefits: (1) reimbursement for qualified past repairs, and (2) coverage for qualified future repairs. *Id*. at 7. We describe each benefit below.

**Reimbursement for Qualified Past Repairs.** Class members can receive reimbursement for a qualified past repair. Such a repair is defined as "a repair that occurred before the Effective Date" of the settlement agreement—which is 14 days after the date on which any final order and judgment entered becomes final—"related to repainting any non-plastic exterior surface of a Subject

Vehicle because of bubbling, peeling or flaking of the exterior clear coat and not caused by external influences such as automobile accidents, scratches, or road debris." D.E. 70-1, Exh. 1 at § 1.27.

The settlement agreement provides different reimbursement amounts based on the Subject Vehicle's age and mileage. With certain limitations, a repair that occurred fewer than seven years or 105,000 miles from the vehicle's original in-service date (whichever occurred first) would yield a 100% reimbursement of the cost incurred to perform the repair. A vehicle not within that category that is fewer than ten years or 150,000 miles from the vehicle's original in-service date (whichever occurred first) would yield a 50% reimbursement of the cost incurred. And a vehicle not within either of those categories that is fewer than fifteen years or 150,000 miles from the vehicle's original in-service date (again, whichever occurred first) would yield a 25% reimbursement of the cost incurred to perform the repair.

This leaves one final category—vehicles with a past repair more than fifteen years or 150,000 miles from their original in-service date (whichever occurred first). Under the agreement, Mercedes-Benz and Daimler are not required to offer any reimbursement for past repairs of these vehicles.

The settlement agreement also provides for reimbursement for past repairs performed by "Independent Service Centers," namely vehicle repair service providers that were not specifically authorized "at the time of repair or presentment to provide warranty services for Mercedes-Benz vehicles." *Id*. at §§ 1.5, 1.15.

Specifically, these reimbursement claims are subject to the same age and mileage categories noted above with the caveat that "the reasonable repair cost to be reimbursed shall not exceed 10% of what the same repair would have cost if it were performed at an Authorized Service Center." *Id*. at § 4.2.

As the district court noted, "[t]here is no limit to the number of claims or total amount of money that Mercedes-Benz will pay to reimburse qualified past repairs, except for the per claim cap on claims performed by Independent Services Providers." D.E. 125 at 8 (citing D.E. 70-1, Exh. 1 at §§ 4.2, 5.1).

**Coverage for Qualified Future Repairs.** Class members also receive coverage for qualified future repairs. As with reimbursement for past repairs, coverage for future repairs is determined based on the vehicle's age and mileage. For a vehicle needing a future repair less than seven years or 105,000 miles from its original in-service date (whichever occurs first), a class member who presents the vehicle at an authorized service center with a qualifying claim will receive 100% coverage for the repair. For a vehicle needing a repair that does not fall within that category and is less than ten years or 150,000 miles after the vehicle's original in-service date (whichever occurs first), the class member will receive 50% coverage for the repair. For a vehicle that does not fall within either of those categories, and that is fewer than fifteen years or 150,000 miles after the vehicle's original in-service date (again, whichever occurs first), the class member will receive 25% coverage for the repair.

The settlement agreement also provides parameters for relief for class members whose vehicles will need future repairs but which, at the time of the settlement notice date, were more than fifteen years or 150,000 miles after their original in-service date (whichever occurs first). In these instances, a class member "may submit documentary evidence showing that (i) he or she presented the [vehicle] to an Authorized Service Center for a qualifying repair or provided notice . . . when the vehicle had less than [fifteen] years . . . and 150,000 or fewer miles . . . and (ii) that he or she was denied warranty or goodwill coverage for such repair at the time." D.E. 70-1, Exh. 1 at § 4.4(d). If the claim is approved, the percentage of coverage provided is determined by the age and mileage of the vehicle at the time it was originally presented for the qualifying repair or when notice was given. For vehicles that do not fall within this category, and that are more than fifteen years or 150,000 miles after their original in-service date, the agreement expressly provides that Mercedes-Benz and Daimler are not required to offer any coverage.

## B

The court-appointed settlement administrator, JND Legal Administration LLC, provided notice of the proposed settlement "to all class members who could be identified with reasonable effort." This notice went out through a postcard via the United States Postal Service.[3]

---

[3] JND's CEO, Jennifer Keough, submitted a declaration explaining how direct notice was provided to class members. *See* D.E. 100-1. Mercedes-Benz and Daimler "provided JND with a list of all eligible Vehicle Identification

Notice was also published on a "Settlement Website" maintained by JND. As of July 28, 2020 (two days before the filing of the motion for final settlement approval), "the Settlement Website had tracked a total of 11,373 unique users who registered 54,908 page views." D.E. 100-1 at 6. JND also maintained an email address and a toll-free telephone number to receive and respond to class members' inquiries. As of July 28, 2020, JND had received 708 emails and 2,100 calls. *See id*. at 6–7. Counsel for the Pinon plaintiffs indicated that they also received hundreds of emails and phone calls. *See* D.E. 100 at 14.

The postcard notice informed class members "that anyone who wished to object to the [s]ettlement could do so by filing an objection" with the district court on or before July 27, 2021. As of July 28, 2021, JND "[was] aware of four [ ] objections from eleven [c]lass [m]embers being filed[.]" D.E. 100-1 at 7. The postcard notice further informed class members that all those who wished to be excluded from the settlement "w[ere] required to notify the [s]ettlement [a]dministrator . . . of their intent to opt out" by July 27, 2021. *Id*. at 8. As of July 30, 2021, JND had received ten "timely and valid exclusion requests." *Id*.

---

Numbers ("VINs") representing the Subject Vehicles included in the [settlement] [a]greement." *Id*. at 2. JND then sent the VINs to the respective department of motor vehicles to gather mailing addresses and contact information. Before mailing the postcard notice, "JND reviewed the mailing data . . . to identify any undeliverable addresses and duplicate records based on name and address." *Id*. at 3. On May 28, 2021, JND mailed the postcard notice to 168,817 potential settlement class members. *See id*. at 4.

For "qualified past repairs," the postcard notice advised class members that they could submit a claim "by July 27, 2021, for repairs that occurred before May 28, 2021, and within 60 days of the date of repair for repairs that occurred after May 28, 2021, and before the Effective Date." *Id*. For "qualified future repairs," the postcard notice advised class members of the following: "[I]f their Subject Vehicle had 150,000 miles or more or was [fifteen] years or more from the original in-service date as of May 28, 2021, and they were previously denied warranty or goodwill coverage for a qualifying repair at a time the Subject Vehicle had both fewer than [fifteen] years from the original in-service date and fewer than 150,000 miles," they could participate in the settlement and receive reimbursement by submitting a claim electronically or by mail postmarked by July 27, 2021. *See id*.

As of July 28, 2021, JND had "received 1,532 [c]laim [f]orms." "[T]he average claimed reimbursement amount per [q]ualified [p]ast [r]epair (excluding claimed amounts of $20,000 or more) [was] between $2,000 and $3,000." *Id*. at 9.

## C

The district court held a fairness hearing on the settlement agreement. The Pinon plaintiffs, Mercedes-Benz, and Daimler spoke in support of the settlement agreement. The district court also heard from the Ponzio objectors and from Cindy Wensell, another objector to the agreement.

As relevant here, the Ponzio objectors asserted at the hearing that "the vast majority of class members are left completely

uncompensated." D.E. 116 at 39. They claimed that "the proposed settlement forces tens of thousands of class members to give up their claims against [the defendants] but provides them nothing in exchange," that "only [ ] a small number of class members [ ] are actually entitled to" 100 percent payment, and that "[t]he other class members are destined to the 25 or 50 percent discounts"—a "dubious value because of the fact that if a consumer is going to make a decision as to whether to repaint a portion of the vehicle or the entire vehicle, they're going to look at what they have to spend and what they would get back if they spent." *Id*. at 41, 52–53. The district court found this last claim to be "flawed because you don't have to do a full paint job on a car to be able to correct the bubbling." *Id*. at 54.

The Ponzio objectors also told the district court that the Pinon plaintiffs had failed to provide an estimate of the range of possible recovery and that, without such an estimate, "it's impossible to determine the expected value going to trial, and likewise, impossible . . . or difficult for this [c]ourt [ ] and the class members to evaluate what they are giving up in exchange for the proposed settlement. *Id*. at 58. Moreover, the Ponzio objectors argued that while compensation for a vehicle's diminished value did not necessarily have to be included in the settlement, the agreement "has to include something. You can't ask the people to release their claims . . . without giving them something." *Id*. at 98.

Given the issues raised during the hearing, the district court asked for supplemental briefing. After receiving that supplemental

briefing, the district court issued an order certifying the class and approving the settlement agreement. With respect to the Ponzio objectors' contentions and arguments, the district court found that "none . . . [were] sufficient to overcome the fairness of the [s]ettlement [a]greement." D.E. 125 at 25.

First, the district court "observe[d] that out of the 168,817 potential settlement class members, the total number of objectors (both timely and untimely) represent[ed] 0.007 percent of the class and . . . eleven objectors (one of whom submitted his objection out-of-time) were submitted by Ponzio's [i]nterim [c]lass [c]ounsel." *Id.* at 29 (italics omitted).

Second, as to the assertion that most class members would receive no relief, the district court found that the Ponzio objectors and their experts reached that conclusion "based upon a significantly flawed premise—that every Subject Vehicle presented for repair *will have to be repainted in its entirety*." *Id.* at 31 (emphasis in original). The district court explained that the settlement agreement "specifically provides that 'qualified' repairs are limited to 'refinishing of affected areas only'"—"anyone who has had their vehicle damaged in an accident is aware that when a quarter panel, hood, trunk, or other separate unit is damaged but the rest of the automobile is not, there is a repainting of the damaged unit, not the entire vehicle[.]" *Id.* at 33. Ultimately, the district court concluded that because the Ponzio objectors' "argument as to the inadequacy of the settlement is based on this flawed premise, none of their statements about most [c]lass [m]embers receiving

'nothing' can be seriously considered." *Id.* The district court provided this explanation:

> [A]ll owners and lessees of Subject Vehicles whose automobiles were placed in service prior to seven years ago with less than 150,000 miles will not be getting 'nothing' but are eligible for reimbursement for qualified past repairs up to 100% of the amount paid for the repairs. Those same persons whose vehicles were placed in service between seven and fifteen years ago are eligible for qualified past repairs at a rate of 25% to 50% depending upon the age of the vehicle. Even those vehicles who were placed in service over fifteen years ago or with over 150,000 miles are eligible for a qualified future repair if they can show they presented their vehicles for such a previous repair or notified [d]efendants of the need for the repair prior to the expiration of 15 years or meeting the 150,000 mile limit.

*Id.* at 33–34.

Third, the district court rejected the Ponzio objectors' argument that the settlement agreement was inadequate because it did not provide for the diminution in value of the vehicle after it is repainted. The district court noted that the Ponzio objectors had failed to provide any case authority for the proposition that there had to be compensation for diminished value. Indeed, the case law suggested the opposite. *See id.* at 36 (citing cases approving settlement agreements that did not compensate for diminution in value).

After we heard oral argument, we requested supplemental briefing from the parties on a number of matters. One of them concerned how many class members were ineligible for benefits (reimbursement or future coverage) under the settlement agreement.

## IV

The Ponzio objectors raise four arguments on appeal. They assert that the district court abused its discretion in (1) "granting final approval of the class action settlement where 80% of the class members are required to release their claims in exchange for no relief[,]" (2) "failing to properly assess the Rule 23(e)(2) and *Bennett* factors[,]" (3) "approving a settlement brokered by class representatives and class counsel who did not fairly and adequately represent the class[,]" and (4) "approving a class settlement where there was indicia of collusion, a reverse auction, and a coupon settlement." Br. of Appellants at 18.

It is "our obligation to closely review the issues [the Ponzio objectors] present," *In re Equifax Custom Data Security Breach Litigation*, 999 F.3d 1247, 1257 (11th Cir. 2021), but we note that they have, during the course of proceedings in the district court and on appeal, provided various different (some would say shifting) explanations as to why they believe that the "vast majority" of the class members are ineligible for any relief under the settlement agreement. Normally we only consider the arguments presented to the district court, *see, e.g.*, *Harbourside Place, LLC v. Town of Jupiter*, 958 F.3d 1308, 1323 (11th Cir. 2020), but in an abundance of caution, we

will discuss all of the permutations presented by the Ponzio objectors on appeal.

We have never provided a detailed explanation of what burden, if any, is borne by objectors to a proposed class action settlement. Given that this appeal concerns objections to the resolution of a class action complaint, we take the opportunity to set out some parameters.

Just as the proponents of a class action settlement bear the burden of developing a record demonstrating that the settlement is fair, reasonable, and adequate, *see Holmes*, 706 F.2d at 1147, objectors to the settlement have some obligations of their own. Rule 23(e)(5)(A) requires that they "state with specificity" the grounds for an objection. This means that objections "must provide sufficient specifics to enable the parties to respond to them and the court to evaluate them." Fed. R. Civ. P. 23(e)(5)(A), Advisory Committee's Note to 2018 Amendment. And when the objections are factual in nature, they cannot be conclusory. *See 1988 Trust for Allen Children Dated 8/8/88 v. Banner Life Ins. Co.*, 28 F.4th 513, 520-21 (4th Cir. 2022) (explaining that the standard is "somewhat analogous" to notice pleading under Rule 8(a)); *Guidance on New Rule 23 Class Action Settlement Provisions,* 102 Judicature 15, 21 (Nov. 2018) (asserting that the amended Rule 23(e)(5)(A) "requires greater specificity of objections"). *See also In re Corrugated Container Antitrust Litig.*, 643 F.2d 195, 213 (5th Cir. 1981) ("[W]here there are objectors, the court is aided in its task; the proponents can be expected to present evidence and arguments suggesting that the settlements are within

'a range of reasonableness' and the objectors will do the same for the contrary position.").

Once proper objections are lodged, the proponents of the settlement must show that the matters raised do not affect the fairness, reasonableness, or adequacy of the agreement. *See 1988 Trust*, 28 F.4th at 521. "The showing necessary to prevent an objection from derailing the settlement will, of course, vary with the strength of the objection itself." *Id*. *See also Cotton v. Hinton*, 559 F.2d 1326, 1331(5th Cir. 1977) ("The trial court must extend to the objectors leave to be heard. However, this is not to say that the trial judge is required to open to question and debate every provision of the proposed compromise."). A "challenge for the [district court] is to distinguish between a meritorious objection and those advanced for improper purposes." David F. Herr, Annotated Manual for Complex Litigation § 21.643 (4th ed. & May 2023 update).

## A

The Ponzio objectors' first argument is that the settlement agreement is "fatally flawed because it releases claims for 100% of the class even though 80% are ineligible for any benefits." Br. of Appellants at 44. The claim that 80% of the class is ineligible for relief is our starting point because it is repeated throughout the Ponzio objectors' briefing. Whether the contention has merit will necessarily inform our assessment of the remaining arguments on appeal.

In their initial brief, the Ponzio objectors claim that "the overwhelming majority of class members will receive no benefits

under the settlement." *Id*. at 46.  They say that if there are 168,817 class members, as the Pinon plaintiffs estimate, 99,702 (or 59%) are former owners or former lessees "who are obviously ineligible for future repainting benefits because they no longer possess their Subject Vehicles." *Id*.  In a footnote, they acknowledge that "[c]onceivably, there may be a tiny fraction of former owners or lessees who paid to repaint their vehicles while still in possession of them, and who filed a claim for reimbursement," but they say that "this is all speculation" and "this figure would be at most 1,532 if 100% of all claims were made by former owners and lessees." *Id*. at 46 n.9.

This calculation, according to the Ponzio objectors, leaves 69,115 class members who are current owners and lessees.  In their view, the "[Pinon] [p]laintiffs' estimates reveal 35,397 are ineligible due to the settlement's age and mileage restrictions.  Thus, taken together, roughly 135,099 of the 168,817 [c]lass [m]embers (80.03%) are ineligible for *future* benefits under the settlement approved by the district court." *Id*. at 47 (emphasis added).

Like the district court, we conclude that the Ponzio objectors' contention is significantly flawed.  Although the task of explaining why is laborious, it is necessary.

First, the underlying calculation of the Ponzio objectors does not account for vehicle owners/lessees who have not experienced (and will not experience) any paint defect on their vehicles.  In this respect, it is worth recalling that the complaint filed by the Pinon plaintiffs alleged that the defect with the Mars Red paint was latent, meaning that the bubbling may or may not take place during

the ownership, lease, or life of the vehicle. *See generally* Black's Law Dictionary 508 (10th ed. 2014) (defining a hidden defect as a "product imperfection that is not discoverable by reasonable inspection and for which a seller or lessor is generally liable *if the flaw causes harm*") (emphasis added).

Second, the calculation fails to recognize that there are class members who satisfy the requirements for reimbursement but choose not to file a claim, as well as class members who do not file a claim because they fail to meet the requirements for past or future coverage. These two categories of class members cannot be conflated into one group to figure out how many class members are categorically ineligible (in the Ponzio objectors' words) to receive benefits under the settlement agreement. The former group, though eligible, is uninterested in seeking reimbursement for one reason or another, and the decision of class members in that group to not file a claim does not mean that the settlement agreement provided no benefits to those in the group.

Third, the calculation ignores the settlement agreement's provision for relief to class members who, at the time of the settlement notice date, have vehicles that are older than fifteen years or have more than 150,000 miles and will need a future repair. *See generally* D.E. 70-1, Exh. 1 at 15–16. Recall that "a [s]ettlement [c]lass [m]ember may submit documentary evidence showing that (i) he or she presented the Subject Vehicle to an Authorized Service Center for a qualifying repair or provided notice to [d]efendants at a time when the vehicle had less than 15 years . . . and 150,000 or

fewer miles . . . and (ii) that he or she was denied warranty or good-will coverage for such repair at the time.  Such [s]ettlement [c]lass [m]ember shall be entitled to submit to the [s]ettlement [a]dministrator . . . a completed and signed Qualified Future Repair Claim Form" and, if approved, will receive coverage "determined by the age and mileage of the Subject Vehicle at the time it was originally presented for the qualifying repair or notice was given to [d]efendants[.]" *Id*. at § 4.4.

The Ponzio objectors state that 35,397 of the 69,115 class members who are current owners and lessees are ineligible for relief because of the settlement agreement's age and mileage restrictions.  But this calculation ignores the benefit described in the paragraph above and assumes—without explanation or evidence—that no class members would fall within this category of relief.  Indeed, the Ponzio objectors firmly represent that "a class member who no longer possesses their Subject Vehicle . . . , or whose Subject Vehicle has exceeded the age or mileage restrictions of the settlement (of which there are approximately 35,000 of these class members), cannot receive either a full *or* a partial repainting at all." Br. for Appellants at 48 (emphasis in original).  As noted, this ignores the relief provided to those who had warranty or goodwill coverage denied.

Fourth, the Ponzio objectors' own supplemental briefing further undermines the claim that 80% of class members are ineligible for relief.  We asked the parties to tell us how many class members are "categorically ineligible" to benefit from the

settlement agreement—i.e., class members who cannot receive from the settlement any compensation, in the form of monetary reimbursement, future coverage for repairs, or any other thing of monetary value—because at the time the settlement was reached, (1) their vehicles were more than fifteen years old or had more than 150,000 miles on them and (2) they had not had their vehicles' paint or clearcoat fixed or given notice to Mercedes-Benz that their vehicles' paint or clearcoat was peeling, flaking, bubbling, fading, discoloring, or poorly adhering. *See* Supp. Briefing Notice at 1. According to the Ponzio objectors, "the [Pinon plaintiffs] have answered this question by stating that the 'vast majority' of class members are not eligible . . . because they didn't experience the paint defect" and, in the alternative, the "possible range is between one [c]lass [m]ember (~.00001%) and 35,396 [c]lass [m]embers (~20.97%), with the answer likely being much closer to 21% than 0%." Supp. Br. for Appellants at 23–24 (footnote omitted).

The Ponzio objectors do not adequately explain why the ineligibility percentage (even under the alternative scenario) is closer to 21% other than stating that "it is very unlikely that many of these [c]lass [m]embers previously repainted their Subject Vehicles or provided sufficient notice to [Mercedes-Benz] of the defect to render them eligible now." *Id*. at 24. Rather, they articulate a mathematical equation that highlights why, as the district court noted, "these absolute statements" just are not true. *See* D.E. 116 at 39.[4]

---

[4] Understandably, the district court thought little of the Ponzio objectors' blanket assertions that the "vast majority of class members get zero dollars." D.E.

21-14503                    Opinion of the Court                    27

The equation proffered by the Ponzio objectors is as follows:

$$X = A + B - C - D - E$$

X represents the number of class members who are categorically ineligible for relief; A is the number of Subject Vehicles that are more than fifteen years old; B is the number of Subject Vehicles that have more than 150,000 miles; C is the number of Subject

---

116 at 39. The district court noted "that's not true for [Ponzio's] own objectors. They don't get zero dollars. . . . they are treated just like everyone else." *Id*. The district court then addressed each of the eight objectors:

> Objector Montgomery complain[ed] about receiving 'nothing,' but her vehicle was totaled, she apparently incurred no costs to repaint her vehicle, she received an insurance payment about the market value of the vehicle, and she offer[ed] no evidence that the [s]ettlement [a]greement adversely affect[ed] her in the slightest. Objector Acuna appear[ed] not to have incurred any costs to repair his Subject Vehicle (he could recover those costs if he did and submitted a claim) and suffered no loss in the market value of the vehicle after his trade-in. Objectors Nelthrope's, Ponzio's, and Madsen's Subject Vehicles are eligible for a repair at 50% of cost. Objector Mull has had his Subject Vehicle repainted twice, once where [d]efendants actually paid for the repaint . . . and the second repaint came at a time when Mull would be eligible for a full reimbursement if he timely submits his claim. Although Objector Salgado's mileage takes his Subject Vehicle out of automatic coverage, if he can show he presented his automobile to an Authorized Service Center or notified [d]efendants within the first fifteen years, he is entitled to coverage similar to others. Objector Parker sold his vehicle in 2020 and does not contend that he received less than the market value of that vehicle.

D.E. 125 at 35.

Vehicles more than fifteen years old and more than 150,00 miles—which is subtracted to avoid double counting; D is the number of otherwise ineligible Subject Vehicles that were repainted; and E is the number of otherwise ineligible Subject Vehicles that were not repainted but made a claim prior to becoming ineligible.

The Ponzio objectors have filled in the equation with the information they say they have:

$$X = 12{,}814 + 32{,}833 - 10{,}251 - D - E$$

Critically, what is missing is D and E—the numbers of otherwise ineligible vehicles that were repaired/repainted and those that were not but whose owners made a claim prior to the vehicles becoming ineligible. The Ponzio objectors say that "it is likely impossible to determine [D] with specificity," and E "is likely very low due to the onerous notice provisions of the [s]ettlement." Supp. Br. for Appellants at 26–27. In their view, it is unlikely that class members received documentation or chose to hold on to such documentation of a rejected claim for a repair that did not take place.[5]

---

[5] As far as we can tell, there is only one class member, Samuel Salgado, who is ineligible under this category. But the record is not clear if he is ineligible because of the allegedly "onerous notice provisions" described. *See* Supp. Br. of Appellants at 24 n.13. Mr. Salgado submitted a declaration stating that his vehicle currently has 180,000 miles, that he has experienced "peeling, flaking, or bubbling" of the exterior paint or clearcoat, and that he has not had his vehicle repainted. *See* D.E. 96-5. Significantly, however, he does not say why he has not had his vehicle repainted or whether he has ever presented the vehicle to an Authorized Service Center or elsewhere for repairs. *See id.*

21-14503                Opinion of the Court                29

So we are left with $X = 35{,}396 – D – E$, and the Ponzio objectors' assertion that "it is likely that the values for D and E are quite low." Supp. Br. for Appellants at 26. This latter claim is unsupported, and the Ponzio objectors acknowledge that the range of "categorically ineligible" class members on this basis is anywhere between zero and 35,396.

We also asked the parties to tell us how many class members are "categorically ineligible" to benefit from the settlement agreement because, at the time the agreement was reached, (1) they were former owners or lessees and (2) they did not, while they owned or leased their class vehicles and while their vehicles were fifteen or fewer years old and had 150,000 or fewer miles on them, either have their vehicles' paint or clearcoat fixed or give notice to Mercedes-Benz that their vehicles' paint or clearcoat was peeling, flaking, bubbling, fading, discoloring, or poorly adhering. *See* Supp. Briefing Notice at 1. Again, in response to this question, the Ponzio objectors claim that the Pinon parties have answered this question (we assume they mean that the vast majority of owners/lessees did not experience a paint defect) and, alternatively, they assert that the possible range they can calculate "is between three [c]lass [m]embers (~.00002%) and 99,702 [c]lass [m]embers (~59.06%), with the answer likely being much closer to 59% than 0%[.]" Supp. Br. For Appellants at 29. As for why they believe that the actual number is closer to 59%, they say—again, without support—that "it is very unlikely that many of these [c]lass [m]embers previously repainted their Subject Vehicles and whether they provided sufficient notice

to Mercedes of the defect is irrelevant to former owners and lessees." *Id.*

Even accepting the Ponzio objectors' proposed ranges, the number of class members categorically ineligible for relief spans anywhere from ~0.00001% and ~20.97% plus anywhere from ~.00002% and ~59.06%. In other words, the number is anywhere from .00003% to 80.03% or "between four [c]lass [m]embers and 135,098 [c]lass [m]embers." *Id.* at 31. The breadth of this range makes it clear that the district court did not abuse its discretion in weighing the Ponzio objectors' purported "evidence" against the proponents' evidence and determining that the settlement agreement was fair, reasonable, and adequate. It is simply not true—at least not on this record—that the settlement agreement failed to provide any relief for 80% of class members. *See, e.g.*, *Cotton*, 559 F.2d at 1330 ("The [district] court should not make a proponent of a proposed settlement justify each term of settlement against a hypothetical or speculative measure of what concessions might have been gained; inherent in compromise is a yielding of absolutes and an abandoning of highest hopes.") (internal quotation marks omitted).

## B

In tandem with their assertion that the district court abused its discretion because it approved a settlement agreement that leaves 80% of the class ineligible for relief, the Ponzio objectors also argue that the court ignored a number of red flags and committed a series of legal errors.

**1**

The Ponzio objectors argue that the district court failed to adequately address the *Bennett* factors and the Rule 23(e)(2) criteria. As part of this argument, they first state that the district court "summarily rejected" their objections "in a single sentence . . . and thus made no finding or conclusions that might facilitate appellate review; instead, [it] offered only rote, boilerplate pronouncements" which is "itself a basis for reversal." Br. for Appellants at 54 (internal quotation marks and citation omitted).

A review of the district court's 58-page order, as well as the transcript of the fairness hearing, belies the claim of summary adjudication. *See* D.E. 125 at 26–44. The district court discussed the quantity and identity of the objectors—noting that they comprised only .007% of the class members—and then proceeded to consider the various objections made, including objections to the adequacy of relief, objections to the terms of the attorneys' fee application, and objections as to the adequacy of class counsel and class representatives. *See id.* at 26–43. The district court also addressed the objection that the settlement agreement was the result of collusion and a reverse auction, as well as the objection that the proposed settlement failed to satisfy the *Bennett* factors. *See id.* at 43–44. The district court's analysis of the *Bennett* factors cites to its earlier analysis in the order—in Part III.B at pages 20–26—which examined the likelihood of success at trial and the complexity, expense, and duration of litigation; the range of possible recovery and the point at which the settlement is fair, adequate, and reasonable; the substance and amount of opposition to the settlement; the state of the

proceedings at which the settlement agreement was achieved; and the judgment of class counsel.  This is not a case where the district court "made no findings or conclusions that might facilitate appellate review," *Johnson v. NPAS Sols., LLC*, 975 F.3d 1244, 1248–49 (11th Cir. 2020), as the Ponzio objectors claim.

Next, the Ponzio objectors claim that the district court "failed to address the range of possible recovery for the [Pinon] [p]laintiffs' claims and the point on or below the range of possible recovery at which the settlement is fair, adequate and reasonable." Br. for Appellants at 54–55.  "Determining the fairness of the settlement is left to the sound discretion of the trial court and we will not overturn the court's decision absent a clear showing of abuse of that discretion."  *Bennett*, 737 F.2d at 986.  *See also Faught*, 668 F.3d at 1240.

The parties to the settlement agreement initially submitted a declaration from Lee M. Bowron, an actuary with Kerper and Bowron LLC, a consulting and actuarial firm.  *See* D.E. 92-2.  Class counsel had requested that Mr. Bowron's firm calculate a range of the economic impact of the then-proposed settlement agreement. *See id*. at 3.  During the fairness hearing, the district court discussed and identified certain issues it had with Mr. Bowron's declaration. For example, it had concern with Mr. Bowron incorporating in his calculation certain costs to Mercedes-Benz (e.g., marketing and administrative costs) because that's "looking at it . . . from [Mercedes-Benz's] stead, not from the plaintiffs' stead."  D.E. 116 at 15.  In other words, the district court was directly (and correctly)

concerned with "what [the agreement is] worth to the class, not what the cost to [Mercedes-Benz] is." *Id*. at 17.  Indeed, the district court made clear that

> [f]rankly, [it didn't] care a whole lot about that . . . . [Mercedes-Benz and Daimler] are sucking it up to settle this case . . . . the value to the class is how many vehicles are going to get repaired, what's going to be the average cost of the repair from a low and a high standpoint.  That's the value to the class.  And that would be the value of an extended warranty to the class members.  Not what the cost is to [Mercedes-Benz].

*Id*. at 17–18.  Given its concern with "look[ing] at it as to the benefit to the class, not the cost to [Mercedes-Benz]," the district court allowed the proponents of the settlement to submit an amended declaration from Mr. Bowron after the fairness hearing.  *See id*. at 20. *See also* D.E. 125 at 39.[6]

In his supplemental declaration, Mr. Bowron provided an estimate of the amounts that Mercedes-Benz was expected to pay. His revised calculation excluded "costs related to administering and selling the hypothetical extended warranty and the estimated value of past repairs"—the latter, because actual values of past repairs were determined.  *See* D.E. 117-2 at 4–5.  Mr. Bowron estimated the value of future repairs to be $13,130,000, with a range between a

---

[6] The district court also allowed the Ponzio objectors to supplement the record after the fairness hearing.

low of $10,504,000 and a high of $15,756,000. *See id*. at 6. "Includ-ing the value of the 1,532 claims for repairs submitted by [c]lass [m]embers ranging from $3.1 million to $4.6 million . . . the total value of the settlement [was] now estimated by [the] [p]laintiffs as averaging between $16.2 million and $17.7 million." *See* D.E. 125 at 39–40.

The Ponzio objectors submitted their own supplemental declaration by Richard Eichmann, a managing director for NERA Economic Consulting. *See* D.E. 121-2. Mr. Eichmann rejected Mr. Bowron's analysis and estimated the potential value of future qual-ifying repairs to be $6.26 million. *See* D.E. 121-2 at 20.

On its review of this evidence, the district court found Mr. Bowron's revised analysis to be reliable. But it also noted that even if it rejected that analysis and credited the Ponzio objectors' valua-tion of future repairs as set forth in Mr. Eichmann's declaration, it would still find that the relief afforded under the settlement agree-ment was adequate. *See* D.E. 125 at 40. This was not an abuse of discretion. The district court carefully reviewed the evidence on valuation of the settlement agreement, discussed its concerns with class counsel and the objectors during the fairness hearing, re-quired additional evidence when it found the evidence to be lacking and not adequately focused on the class members, and reconsid-ered the parties' supplemental briefing before reaching its conclu-sion. The district court clearly "[took] on a type of fiduciary role for the class," *see In re Equifax Inc.*, 999 F.3d at 1265, when it ensured that the value of the settlement be determined from the class

members' perspective, and not that of Mercedes-Benz and Daimler. *See* D.E. 116 at 17.

We are also unpersuaded by the Ponzio objectors' contention that the district court improperly analyzed the first, fourth, and sixth *Bennett* factors. These factors are, respectively, "the likelihood of success at trial," "the complexity, expense and duration of litigation," and "the state of proceedings at which the settlement was achieved." *Bennett*, 737 F.2d at 986. During the fairness hearing, the district court noted that the Pinon plaintiffs (and the Ponzio objectors in their action in the District of New Jersey) had "a lot of their claims" dismissed at the motion to dismiss stage of the litigation. D.E. 116 at 41. In its final order, the district court explained that there was "significant uncertainty as to whether [p]laintiffs could succeed on their remaining claims . . . either at the summary judgment phase or at trial" and "[e]ven if a jury awarded the settlement class more in damages that [sic] they will receive under the [s]ettlement [a]greement, such an outcome is far from guaranteed and any such relief would occur, if at all, after years of protracted litigation, including appeals." D.E. 125 at 17–18.

One of the main contentions the Ponzio objectors asserted below was that the agreement did not provide relief for diminution in value of the vehicles caused by the latent paint defect. To obtain such monetary relief would require not only survival at the summary judgment phase, but ultimate success at trial on both liability and on a diminution-of-value damages theory—a feat the district court expressly found to be "highly unlikely." *Id*. at 22. And even

then, the district court noted, "the case would likely undergo a protracted appellate process with an affirmance of the district court's decision far from certain." *Id*. at 22–23. As we explained in *Ault v. Walt Disney World Co.*, 692 F.3d 1212, 1218 (11th Cir. 2012), "[t]he issue before us is not who prevails over whom, but rather the question is whether the district abused its discretion in its finding regarding who was *most likely* to prevail at trial." To add to the uncertainty of success, and without expressing a view on the issue, we note that "a number of courts presented with class action claims for the diminution in value of allegedly defective vehicles have honed in on the inherent difficulties in attempting to calculate such damages on a classwide basis," and—at least as of a decade ago—case law "regarding the use and availability of subclasses to address diminution in value issues in vehicle class actions [wa]s sparse." Scott Elder & Travis Thompson, *Recent Developments in Automobile Consumer Class Actions*, 41 Brief 44, 47–48 (A.B.A. 2011). The Ponzio objectors have presented no recent data to the contrary.

The district court considered the likelihood of class members' success at trial and, in doing so, deemed the settlement agreement fair and reasonable. Neither Rule 23 nor the *Bennett* factors require a district court to find that a settlement agreement provides the same scope of relief that could be obtained if class members were wholly successful at trial. *See Bennett*, 737 F.2d at 986 ("[O]ur judgment is informed . . . by the realization that compromise is the essence of settlement."); *Cotton*, 559 F.2d at 1330 ("Neither should it be forgotten that compromise is the essence of a settlement.").

"As we have emphasized elsewhere, 'a just result is often no more than an arbitrary point between competing notions of reasonableness.'" *Bennett*, 737 F.2d at 987 (quoting *In re Corrugated Container Antitrust Litig.*, 659 F.2d at 1325).

Finally, in its analysis, the district court also found it "significant that few civil trials in [its] district [had] been scheduled since the beginning of the COVID-19 pandemic and, given the backlog of criminal cases . . . and the likelihood of dispositive motions being filed . . . it is unlikely that this case would be tried within the next two years, if then." D.E. 125 at 18 n.7. And during this "protracted litigation process, [c]lass [m]embers, many of whom possess vehicles with model years over a decade old, would be without any remedy while their vehicles experience further depreciation from age or wear and tear." *Id.* at 23. We see no abuse of discretion with this reasoning either.[7]

**2**

The Ponzio objectors argue that the settlement agreement has the "[h]allmarks of [i]nadequacy of [c]ounsel." Br. for Appellants at 62. They state that "the class representatives receive[d] significantly better treatment than the majority of class members who suffered the same damages from identical conduct." *Id.* at 63. This argument largely rests on the underlying claim that "80% of the

---

[7] The Ponzio objectors' remaining arguments against the district court's analysis of the Rule 23 criteria are based on the claim that 80% of the class members receive nothing. Because we have already rejected that claim, we do not further discuss these remaining arguments.

class members [ ] are ineligible for any benefits." *Id.* But for the reasons already explained, we are unpersuaded by this claim. So the assertion that "[n]o competent counsel or class representative, tasked with representing the 80% who receive nothing, would ever have agreed to such a settlement," *id.* at 64, while seemingly correct as an abstract principle, is inapplicable here. The district court was "entitled to rely upon the judgment of experienced counsel for the parties. Indeed, the [court], absent fraud, collusion, or the like, should be hesitant to substitute its own judgment for that of counsel." *Cotton*, 559 F.2d at 1330.

For essentially the same reason, we also reject the Ponzio objectors' argument that "the economic interests of substantial portions of the [c]lass [m]embers are in substantial conflict" and the "interests of the [Pinon] class representatives are not aligned with, and are actually antagonistic to, the interests of a majority of [c]lass [m]embers—those who are not eligible for any relief and those eligible for less relief than the class representatives for no legitimate reason." Br. for Appellants at 76. Again, the Ponzio objectors' argument here is based on the claim that the "vast majority [of the class] get[s] nothing." Br. for Appellants 74–75. As we have explained, that is simply not the case.

**3**

The Ponzio objectors assert that the settlement agreement reflected collusion, a reverse auction, and the absence of arm's-length negotiations. The district court rejected these assertions, and determined that the settlement agreement "was not the

product of fraud or collusion but negotiated at an arm's-length formal mediation conducted by a neutral, highly respected mediator[,]" former United States District Judge James F. Holderman. D.E. 125 at 17.

The record before the district court included a declaration from Judge Holderman stating, among other things, that he "personally witnessed that each side and their [c]ounsel conducted their mediated settlement negotiations in an adversarial, arm's length, and non-collusive manner" and that "both sides approached the settlement negotiations in good faith and worked accordingly while vigorously maintaining integrity to their positions." D.E. 70-3 at 3. Judge Holderman also indicated that "after the agreement-in-principle was reached . . . as to the terms and conditions of the proposed class settlement, each side's [c]ounsel then mediated attorney fees, expenses, and class incentive awards to reach an agreement on those issues." *Id*. at 3–4. Thus, "[t]he issue of attorney fees, expenses, and class incentive awards had not been discussed prior to the [p]arties reaching an agreement-in-principle on the terms and conditions of the proposed class settlement." *Id*. at 4. This sequence helps avoid a claim of conflict on the part of class counsel. *See* Herr, Annotated Manual for Complex Litigation § 21.7 ("Separate negotiation of the class settlement before an agreement on fees is generally preferable.").

The district court acted within its discretion in crediting Judge Holderman's perspective and opinion. As it explained, "[t]he close participation of . . . Judge Holderman in multiple mediation

sessions support[ed] the procedural fairness of the [s]ettlement [a]greement." D.E. 125 at 17. The Ponzio objectors have shown no error, much less reversible error. *See, e.g.*, *Robinson v. Nat'l Student Clearinghouse*, 14 F.4th 56, 59 (1st Cir. 2021) (concluding that a class action settlement agreement reached in mediation before a retired judge was the product of arm's length negotiations).[8]

**4**

Finally, the Ponzio objectors assert that the settlement constitutes a disfavored coupon settlement that required, but did not receive, heightened scrutiny. *See, e.g.*, *In re HP Ink Jet Printer Litigation*, 716 F.3d 1173, 1178 n.4 (9th Cir. 2013) (stating that coupon settlements are "generally disfavored," but explaining that they can sometimes "be appropriate"). We again disagree.

Coupon or paper settlements "typically involve the extension or expansion of an existing warranty or coupons for rebates on future purchases from defendants." *Davis v. Carl Cannon Chevrolet-Olds, Inc.*, 182 F.3d 792, 798 (11th Cir. 1999) (Nangle, J. concurring). *See also* Rubenstein, 4 Newberg on Class Actions § 12:8 ("In a coupon settlement, a class action is litigated, and the class'[ ] claims are settled in return for a coupon or voucher applicable to future purchases of the defendant's products."). The district court

---

[8] For the same reasons, we are also unpersuaded by the Ponzio objectors' characterization of the settlement agreement as a reverse auction—a scenario "in which a defendant picks out a plaintiff with weaker claims and weaker counsel in an effort to negotiate a more favorable settlement." *Tech. Training Assocs., Inc. v. Buccaneers Ltd. P'ship*, 874 F.3d 692, 695 (11th Cir. 2017).

concluded that the settlement agreement was not an "improper coupon settlement" because it "does not involve any coupons or vouchers but direct cash payments to those [c]lass [m]embers who previously paid for repairs or coverage for future repairs." D.E. 125 at 37.

The Ponzio objectors argue that "[t]he 20% of class members eligible for relief receive no cash for possible future repairs . . . and this 20% is merely eligible for discounts on possible future repairs at an Authorized [Mercedes-Benz] Service Center." Br. for Appellants at 79. We are, in part for reasons already discussed, unpersuaded. The settlement agreement, as the district court correctly noted, does not involve coupons or vouchers. Rather, § 9.8 of the agreement provides that "[s]ettlement [c]lass [m]embers may elect to receive payment of their claims via electronic payment (*e.g.*[,] Venmo or PayPal) in a form agreed to by the [s]ettling [p]arties, or by written check." D.E. 70-1, Exh. 1 at § 9.8.

## V

We have carefully reviewed the parties' briefs and the record, including the transcript of the fairness hearing, the supplemental briefing below and on appeal, and the order approving the class action settlement. We are satisfied that the district court took the objections of the Ponzio objectors seriously and, after rejecting

those objections, acted within its discretion in approving the settlement agreement.[9]

**AFFIRMED**.

---

[9] The Ponzio objectors request that the district court replace the Pinon plaintiffs' counsel and their class representatives "with adequate counsel and representatives" and "consider the creation of subclasses with separate class representatives and separate counsel to ensure adequate structural protection of the interests of absent class members." Br. for Appellants at 81. Because we do not find that the district court abused its discretion in approving the settlement agreement, this request is denied as moot.